**Ann LOVELL, as Personal Representative of the Estate of John M. Lovell, Sr., Plaintiff,**

v.

**The ONE BANCORP, Maine Savings Bank, Frederick W. Pape, Jr., and Nancy Masterton, as Personal Representative of the Estate of Robert R. Masterton, Defendants.**

Civ. No. 87–0296–P.

United States District Court,
D. Maine.

July 14, 1988.

---

———

Richard E. Poulos, John S. Campbell, Portland, Me., for plaintiff.

Roger A. Putnam, Verrill & Dana, Portland, Me., for One Bancorp and Maine Sav. Bank.

Harold E. Woodsum, Jr., Jay S. Blumenkopf, Drummond, Woodsum, Portland, Me., for Frederick W. Pape, Jr.

Gerald F. Petruccelli, Portland, Me., James D. St. Clair, John F. Batter, Hale and Dorr, Boston, Mass., for Robert R. Masterton.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS

GENE CARTER, District Judge.

### I. INTRODUCTION

Plaintiff filed this action to challenge Defendant Maine Savings Bank's 1984 conversion from a mutual association to a stock corporation.[1] Plaintiff, a depositor in Maine Savings Bank ("Bank"), brings the action under Title 42 U.S.C. § 1983, claiming that the conversion, the process by which it was approved, and the Maine statutes and regulations that authorized it violated numerous state and federal constitutional rights and state statutory provisions. He has asked that the Court nullify the conversion. In the alternative, he seeks compensatory damages of $150 million and punitive damages of $50 million.

Plaintiff has named as Defendants Bank (the converting institution), The One Bancorp (the holding company formed to hold Bank's capital stock after conversion), Robert Masterton (chief executive officer and director of Bank and Bancorp), and Frederick Paper (chairman of the executive committee of Bank's and Bancorp's boards of directors).[2]

Defendants have moved for judgment on the pleadings, claiming that Plaintiff is precluded from bringing this action, and that abstention is warranted under the principles of *Burford v. Sun Oil*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). They claim, in the alternative, that the conversion was legitimately approved and legally executed, that the statutes authorizing it are lawful, and that it did not impinge upon any rights Plaintiff had in Bank before or after conversion.

For reasons set forth in this opinion, the Court denies Defendants' motion.

### II. MAINE'S MUTUAL–TO–STOCK CONVERSION STATUTES

In 1975, the Maine legislature enacted legislation that authorizes mutual financial institutions to convert to stock ownership, and prescribes the procedure by which they must do so. Title 9–B M.R.S.A. § 344 authorizes a mutual-to-stock conversion if:

1. The converting bank adopts a conversion plan that provides equitably for the bank's depositors;[3]

2. The Superintendent of Maine's Bureau of Banking approves the plan as fiscally prudent and equitable to depositors; and

3. Two-thirds of the bank's depositors approve the plan.

The provisions of the bank's conversion plan are prescribed by the Federal Home Loan Bank Board's regulations on mutual-to-stock conversions, 12 C.F.R. § 563b, which the Superintendent has adopted to govern in-state conversions.[4] Section 563b.3 requires that the conversion plan give depositors nontransferable subscrip-

---

1. The original plaintiff in this action, John M. Lovell, Sr., died on March 1, 1988. His death was suggested upon the record on March 28, 1988. On May 26, 1988, Ann Lovell was substituted herein as his personal representative, pursuant to Fed.R.Civ.P. 25(a)(1).

2. Mr. Masterton's death was suggested upon the record May 26, 1988. His personal representative, Nancy Masterton, was substituted for him as a party defendant in this action on that date.

3. The conversion plan must also ensure "that [the] conversion will not have an adverse im-

pact on the stability of any other financial institution." 9–B M.R.S.A. § 344(1); 12 C.F.R. § 563b.3(c)(21).

4. Plaintiff has challenged the validity of the Superintendent's adoption of these regulations, and the propriety of their applicability to Bank's conversion. *See* discussion, *infra*. Because the regulations *did* govern Bank's conversion, however, the Court assumes their validity and applicability for the purposes of this statutory explanation only.

tion rights to buy stock in the new bank, 12 C.F.R. § 563b.3(c)(2); assure depositors accounts in the new bank equal to their accounts in the converted bank, 12 C.F.R. § 563b.3(c)(12); and protect depositors' interests in the converted bank's net worth by creating a liquidation account, 12 C.F.R. § 563b3(c)(13).

The liquidation account is created for the benefit of depositors and establishes a priority for liquidation. Depositors have an inchoate interest in the account, equal to their deposits at the converted bank, that vests if the new bank completely liquidates after converting. To establish a liquidation account, the new bank must segregate funds equal to its net worth at the time of conversion. 12 C.F.R. § 563b.3(f).

After the converting bank adopts a conversion plan with the requisite provisions, the Superintendent must pass on and approve it before it becomes effective. Before doing so, the Superintendent must instruct the converting bank to notify depositors and the public of the proposed conversion and of their right to request a hearing and submit written comments, including objections. 9–B M.R.S.A. § 252(2)(B); 12 C.F.R. § 563b.4(a)(v). The timing, type and content of the notice are strictly prescribed by Title 5 M.R.S.A. § 9052 and 12 C.F.R. § 563b.4.

If a hearing is requested, the Superintendent must conduct it. Whether or not a hearing is requested, the Superintendent must invite written comments, including objections, from interested parties. 9–B M.R.S.A. § 252(4); 12 C.F.R. § 563b.4. If, after considering the bank's conversion plan, written comments and hearing evidence, the Superintendent finds the proposed conversion equitable to the deposi-

tors and to the bank, the Superintendent must issue a preliminary approval order.[5]

The conversion plan must then be submitted to depositors for their approval. 9–B M.R.S.A. § 344(3). The converting bank must convene an annual or special meeting at which depositors may vote upon the proposed conversion. Depositors must be notified at least 15 days before the voting meeting of the proposed conversion and of their right to vote for or against it. 9–B M.R.S.A. § 353(3)(A). They must be informed, in addition, that all persons not *personally* casting votes at the meeting will be considered to have voted in favor of conversion, in accordance with Title 9–B M.R.S.A. § 353(3)(B).[6]

If the depositors approve the plan, the converting bank must submit to the Superintendent an "opinion of counsel" certifying that the depositor voting meeting complied with all state and federal laws and regulations. 12 C.F.R. § 563b.8(c)(2). The bank must then submit the executed conversion plan, certifying that the conversion complies with all applicable state laws and regulations. 9–B M.R.S.A. § 343(4)(A).

The Superintendent must then determine "as a condition precedent to issuing a [conversion] certificate that all applicable requirements of Federal law, if any, have been complied with by the converting institution." 9–B M.R.S.A. § 344(4). If the Superintendent is satisfied that the conversion plan complies with all applicable state and federal laws, that the converting bank has complied with all applicable federal law, and that the conversion is equitable to all parties, the Superintendent must then issue a certificate declaring the conversion final. By state law, the certificate is "con-

**5.** The Superintendent must, in addition, determine that the conversion will not adversely affect other financial institutions. *See* note 3, *supra;* note 7, *infra.*

**6.** Title 9–B M.R.S.A. § 344(3) provided, at the time of the depositors' voting meeting:

A ⅔ vote of the corporators or members of each participating institution shall be necessary to approve the plan of [conversion] presented by its board of directors. Any corporator or member not present at such meeting in person shall be regarded as having

affirmatively voted for the [conversion], and shall be counted among the required ⅔ vote; provided that notice of this fact shall have been contained in the published and mailed notices; and provided further that such notice was mailed to the corporator or member [at least 15 days prior to the meeting].

Title 9–B M.R.S.A. § 344(3) has since been amended to permit voting by written ballot, in addition to voting in person. 1981, c. 553, § 1; 1985, c. 251.

clusive evidence of the conversion, and of the correctness of all proceedings relating thereto, in all courts and places." 9–B M.R.S.A. § 343(4)(B).

Parties aggrieved by the Superintendent's final approval of the conversion may request judicial review in Superior Court by filing, within forty days of the Superintendent's approval, a petition for review. The Superior Court may also review "preliminary, procedural, intermediate and other non-final agency action" if review of the Superintendent's final approval would not provide an adequate remedy. 5 M.R.S.A. § 11001 (made applicable by 9–B M.R.S.A. § 256).

The Superior Court is authorized to reverse or modify the Superintendent's approval if that approval violates constitutional or statutory provisions, exceeds the Superintendent's statutory authority, is based upon unlawful procedure, is affected by bias or error of law, is unsupported by substantial evidence, or is arbitrary, capricious or an abuse of the Superintendent's discretion. 5 M.R.S.A. § 11007(4). Superior Court decisions on the propriety of the Superintendent's actions may be appealed to the Supreme Judicial Court. 5 M.R.S.A. § 11008(1).

### III. MAINE SAVINGS BANK CONVERSION

On December 15, 1983, Bank's Board of Trustees adopted a Plan of Conversion ("Plan") providing that a holding company be created to hold Bank's newly created capital stock; that the holding company, Bancorp, raise capital through two stock offerings, one to subscription holders and one to the public; and that Bank grant subscription stock rights and create a liquidation account.

Bank submitted the Plan to the Superintendent of Maine's Bureau of Banking for approval. The Superintendent set a one-month comment period. Bank simultaneously filed the Plan with the Federal Reserve Board, asking the Board to approve the creation of Bancorp. Bank published notices of both applications.

On March 28, 1984, the Federal Reserve Board approved the formation of Bancorp. On April 2, 1984, Maine's Superintendent conditionally approved Bank's conversion, finding that the Plan "will promote the convenience and needs of the public and will be conducted in a fair and equitable manner." [7] Notice of the Superintendent's conditional approval order was published.

Eligible depositors were notified by mail of the conversion and of their right to vote for or against it at a forthcoming meeting. The notice informed depositors of the principal effects of the conversion, of the operation of Maine's presumptive voting law (*see* footnote 2), and of their right to seek judicial review of the Superintendent's approval, if granted.

At a special voting meeting on May 11, 1984, eligible depositors approved the conversion.[8] Proof of the depositors approval was forwarded to the Superintendent.

Bancorp conducted the requisite two stock offerings, raising $43.7 million. Bancorp transferred $5.8 million to Bank as working capital. Proof of the stock issue was sent to the Superintendent who, on June 12, 1984, issued a certificate declaring the conversion final.

### IV. PLAINTIFF'S CHALLENGE

Plaintiff filed this action on October 2, 1987, alleging that Bank's conversion, the

---

7. The Superintendent's conditional approval order also found that "there does not appear to be a likelihood of adverse impact on the other financial institutions in the market area to be served." Bureau of Banking Conditional Approval Order, p. 2 (Exhibit 16 to Bank's Answer). Further, the order required that Bank maintain its preconversion capital-to-asset ratio, secure the approval of two-thirds of its depositors, conduct the requisite stock offerings, and secure favorable tax rulings on its conversion plan.

8. Only 37 of 88,905 eligible depositors attended the voting meeting. Twenty-six voted in favor of conversion. Nine voted against conversion, and two abstained. In accordance with 9–B M.R.S.A. § 353(3)(B), affirmative votes were cast on behalf of all depositors who did not attend.

process by which it was approved, and the Maine statutes that authorized it were unconstitutional. His claims arise chiefly from his assertion that as a depositor in a preconversion mutual association, he "owned" a portion of the association proportionate to his deposits there, and thus had a protected property interest for which he was entitled to be compensated. He claims that the conversion deprived him of that property interest without affording him due process, equal protection [9] or adequate compensation.

His claims can readily be segregated into two groups: those challenging the procedural integrity of the conversion, and those challenging the conversion Plan's substantive provisions.

### A. *Claims of Procedural Impropriety*

Plaintiff's due process claims arise primarily from two sources. First, he challenges the sufficiency of the notice Defendants gave depositors prior to the depositors' voting meeting. He claims that notice to depositors was fraudulently or negligently inaccurate, incomplete and untimely. He claims that these alleged deficiencies were designed to—and did—prevent effective opposition to the conversion.

Second, Plaintiff challenges the process by which depositors approved the conversion. He claims that Maine's presumptive voting statute, under which Bank's depositors were deemed to have approved the conversion, impaired his right to vote on the conversion, a right he claims is constitutionally protected.[10] He claims that neither the voting meeting nor the vote itself were valid without a quorum of eligible voters present. These procedural flaws, he claims, render the vote to approve the conversion invalid.

He claims that the Superintendent's allegedly informal adoption of the Federal Home Loan Bank Board's ("FHLBB") mutual-to-stock conversion regulations (12 C.F.R. § 563b) was inequitable to depositors and violated Maine administrative law, which requires a notice and comment period. He claims, on these bases, that the FHLBB regulations were unlawfully applied to Bank's conversion, and render the conversion invalid.

### B. *Substantive Challenges*

Next, Plaintiff claims that the conversion itself failed to provide equitably for the depositors' interests, in violation of 9–B M.R.S.A. § 344.[11] Plaintiff claims that the nontransferable subscription stock rights he was given upon conversion offered him no benefit, because he chose not to take advantage of them. He claims that his interest in the newly created liquidation account was illusory, because the interest vested in extremely narrow circumstances, decreased whenever his deposits dropped below their conversion date level, and was extinguished ten years from conversion. He claims, therefore, that he was inadequately compensated for his alleged ownership interest in Bank's preconversion net worth.

Plaintiff claims, further, that Bancorp and its stockholders were unjustly enriched by the conversion which, Plaintiff claims, enabled Bancorp to purchase Bank for a fraction of its value, and enabled the stockholders to reap the benefits of Bank's net worth without compensating depositors.

---

**9.** Plaintiff claims that he, as a depositor in a mutual association, is entitled to the same rights upon conversion as policyholders in a mutual insurance company. Policyholders are entitled under 24–A M.R.S.A. § 3477, to a *pro rata* distribution of the company's net surplus upon conversion to stock ownership. Thus, upon conversion, policyholders receive stock in the newly created company, or cash equal to their equity interest in the preconversion mutual company. Plaintiff claims he is denied equal protection of law if he is denied the same *pro rata* distribution.

**10.** Plaintiff did not personally attend the meeting, and thus did not personally cast a vote. His ballot was therefore presumed to be in favor of conversion.

**11.** Title 9–B M.R.S.A. § 344 authorizes mutual-to-stock conversions "provided that such conversion is conducted in a manner equitable to all parties thereto." Section 344(1) requires the converting institution's board of directors to adopt a plan "which shall insure that the interests of depositors and account holders in the net worth of the institution are equitably provided for."

## V. DEFENDANTS' MOTIONS

On December 22, 1987, Defendants Bank and Bancorp filed Motions for Judgment on the Pleadings, pursuant to Fed.R.Civ.P. 12(c). Defendant Pape filed a similar motion on January 11, 1988. Collectively, Defendants claim that Plaintiff's action is precluded by the statutory provision that makes the Superintendent's conversion certificate "conclusive evidence of the conversion, and of the correctness of all proceedings relating thereto, in all courts and places." 9–B M.R.S.A. § 343(4)(B).

The purpose of this provision, Defendants claim, is to require that all challenges be raised through the administrative approval process *before* final action is taken. Plaintiff did not raise his challenges before the conversion was declared final. He did not request a hearing, submit written comments or seek judicial review of the Superintendent's approval of Bank's conversion. Defendants claim the "conclusive evidence" provision bars him from doing so now.

Defendants claim, in the alternative, that the Federal Reserve Board has exclusive jurisdiction to pass on federal and state challenges related to the formation of a bank holding company. They claim, on this basis, that this court lacks subject matter jurisdiction over Plaintiff's action.

Defendants next claim that, if Plaintiff is permitted to pursue judicial review, this Court should abstain from exercising jurisdiction under *Burford v. Sun Oil Co.*, They claim that federal intervention in this action would disrupt Maine's comprehensive network of laws governing bank conversions, an issue of utmost public importance and traditional state concern. They claim, further, that the existing regulatory system provides for adequate review of the Superintendent's actions.

On the merits, Defendants claim that Plaintiff had no protected property interest in Bank's preconversion net worth. They claim that depositors in a mutual association hold only an inchoate interest in the association that vests only if the association liquidates while solvent, a highly unforeseeable event. They claim that conversion to stock ownership differs substantially from solvent liquidation, and does not vest the depositors' inchoate interest.

Defendants claim, further, that even if Plaintiff had a vested interest in Bank's preconversion net worth, that interest was not impinged by the conversion. In fact, Defendants claim, Plaintiff's inchoate interest was protected in full in the newly created liquidation account, which complied with state-adopted federal regulations.

Defendants deny that preconversion notice to depositors was in any way deficient, intentionally or innocently. They claim, in addition, that Plaintiff had no constitutionally protected right to vote on the proposed conversion, and thus suffered no deprivation when, under Maine's presumptive voting statute, his vote was presumed affirmative.

## VI. ANALYSIS

### A. *Legal Standard*

Judgment on the pleadings is warranted under Fed.R.Civ.P. 12(c) when there exist no genuine issues of material fact, and the moving party establishes that it is entitled to judgment as a matter of law. *Beal v. Missouri Pacific Railroad Co.*, 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941). The factual allegations in the complaint must be taken as true, and the legal claims assessed in the light most favorable to plaintiff. *National Metropolitan Bank v. United States*, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383 (1945). To render judgment on the pleadings, the court must be certain that plaintiff is entitled to no relief under any set of facts that could be proved in support of his claim. *Brown v. Bullock*, 294 F.2d 415 (2d Cir.1961).

### B. *Preliminary Procedural Claims*

The parties here do not appear to dispute the central facts: that Bank adopted a conversion plan, submitted it to the Superintendent, sought and received the Federal Reserve Board's permission to form Bancorp, issued stock, and converted. Indeed, factual controversy does not appear to underlie Plaintiff's action, or these motions. Were the analysis to end here, judgment on the pleadings would be justified.

■ Defendants have not established to the Court's satisfaction, however, that they are entitled to judgment as a matter of law. Defendants claim, first, that Plaintiff's action is barred by the "conclusive evidence" provision in Title 9–B M.R.S.A. § 343(4)(B). Indeed, Maine law appears to lend some support to this contention.

In *McGary v. Barrows*, 163 A.2d 747, 156 Me. 250 (1960), the Maine Law Court rejected a constitutional challenge against a conclusive evidence provision similar to that at issue here.[12]

> We see no objection under the constitution to the action of the Legislature in making such a certificate conclusive evidence of the fact of incorporation.... The purpose of such provision ... is to make clear and certain to all who may deal with School Administrative Districts that there are no hidden difficulties in the organization and that ... the necessary statutory steps have been duly and properly taken.

156 Me. at 263, 163 A.2d 747.

The court dismissed the claim that enforcing the conclusive evidence clause opened the administrative process to fraud and mistake. "There is no reason to believe that facts which should prevent the issuance of a certificate of organization will not come to light before final action." 156 Me. at 264, 163 A.2d 747.

Recalling the legislature's historic use of conclusive evidence clauses, the Law Court cited a bank merger law with language identical to that contained in the mutual-to-stock conversion statute.[13]

> The practice of giving to a certificate of organization the force of conclusive evidence of the fact certified is not new. Since at least 1876 Legislatures have repeatedly made use of this technique

where it would appear the public interest is advanced by certainty.
156 Me. at 264, 163 A.2d 747.

On its face, then, *McGary* appears to support Defendant's conclusion that the conclusive evidence provision in Maine's mutual-to-stock conversion statute requires that all challenges be raised before final action, and bars claims after the conversion certificate is issued. On closer examination, however, *McGary* is distinguishable, and does not preclude Plaintiff's action.

The *McGary* court hinged its decision on the legislature's right to choose administrative certainty over procedural fairness by giving state administrative agencies "the authority to speak finally for the State without the right of appeal." *Id.* at 263, 163 A.2d 747. *McGary* was decided, however, in 1960, fifteen years before Maine's Administrative Procedure Act ("APA") was passed. The School District Commission's ruling, therefore, was not subject to statutory review.

The mutual-to-stock conversion statutes at issue here expressly subject the Superintendent's decisions to Superior Court review, by incorporating Maine's Administrative Procedure Act. 5 M.R.S.A. § 11001, *et seq.* The legislature has thus subordinated certainty to fairness, and has, despite the conclusive evidence clause, chosen *not* to give the Superintendent "the right to speak finally for the State without the right of appeal."

There is, therefore, a significant inconsistency between the conversion statute's "conclusive evidence" clause, as interpreted in *McGary*, and its express incorporation of the Maine APA's review provisions. Defendants have not resolved this inconsistency to the satisfaction of the Court, and thus have not demonstrated to a certainty that the conclusive evidence clause in Maine's mutual-to-stock conver-

---

**12.** The statute at issue in *McGary,* governing the organization of school administrative districts, required the School District Commission to issue a certificate of organization after finding that district members had approved the district's formation in accordance with state law. "The issuance of such certificate by the School District Commission shall be conclusive evidence of the lawful organization of the School Administrative District."

**13.** The Court cited R.S., c. 59, § 149, under which the certificate of the bank commissioner "shall be conclusive evidence of the merger and of the correctness of all proceedings therefor in all courts and places."

sion plan, interpreted in light of *McGary*, precludes Plaintiff's action.[14]

█ Defendants claim, next, that this Court has no jurisdiction over Plaintiff's claims. Citing *Whitney National Bank v. Bank of New Orleans*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), Defendants claim that the Federal Reserve Board had exclusive jurisdiction over all state and federal legal issues, both constitutional and statutory, that arose in the context of the proposed holding company formation. Because the legality of the underlying bank transaction so "arose," they argue, Plaintiff could have raised his present claims before the Board prior to conversion, and is precluded from raising them here before this Court.

*Whitney* is distinguishable on its facts, however, and does not prevent this Court from exercising jurisdiction over Plaintiff's claims. In *Whitney*, a national bank attempted to circumvent state law [15] through a complex series of transactions requiring the formation, under federal law, of one bank holding company and, ultimately, one national bank.[16]

The federal Comptroller of the Currency conditionally authorized the organization of the new national bank.[17] The Board then approved the holding company formation.

Two competitor banks appealed the Board's approval through statutory channels.[18]

At the same time, three state-chartered banks brought a federal action to enjoin the Comptroller from issuing a final certificate of authority to the new national bank, alleging that the new national bank would violate Louisiana's home parish law. The district court upheld the Louisiana law, found that the proposed transaction would violate it, and permanently enjoined the Comptroller from certifying the new national bank. The United States Supreme Court reversed, finding that the district court had no jurisdiction over the state banks' claims.

The state banks had framed their action as an objection to the Comptroller's authorization of the new national bank, the court found. But it held that the Comptroller's authorization of new banks, although a prerequisite to Board approval of a holding company's formation, was not "final action," and was not subject to independent challenge under the Bank Holding Company Act, the federal Administrative Procedure Act, or any other federal statute. *Id.* at 419, 85 S.Ct. at 556–57.

Further, the Comptroller was bound by the Board's ruling on holding company formation. *Id.* The Comptroller's authoriza-

---

14. The Court detects that this question—whether the Maine legislature's incorporation of the Maine APA's review provisions in the mutual-to-stock conversion statutes negates the conclusive evidence clause in those statutes—could, on a more developed record, be certified to Maine's Law Court. *See* Me.R.Civ.P. 76B; 4 M.R.S.A. § 57; *In re Richards*, 253 F.Supp. 913 (D.Me. 1966).

15. The Louisiana law at issue, La.Rev.Stat. § 6:54 (1950), prohibited banks from opening branches outside their home parish (county). The law was made applicable to national banks by the federal Banking Act of 1933, 12 U.S.C. § 36(c)(2).

16. Under the proposed transaction, the initiating bank ("Bank One") would form a holding company under federal law. The holding company would, in turn, organize a new national bank ("Bank Two"). Bank One would then merge into Bank Two. The resulting bank would declare a dividend to its owner, the holding company. The holding company would then organize a third national bank ("Bank

Three"), which would be located outside Bank One's home parish.

17. His approval was made subject to Federal Reserve Board approval of the holding company formation.

18. The Bank Holding Company Act of 1956, 12 U.S.C. § 1848, provides:

Any party aggrieved by an order of the Board under the provisions of [the Bank Holding Company Act] may obtain a review of such order in the United States Court of Appeal within any circuit wherein such party has its principal place of business, ... by filing in the court, within thirty days after the entry of the Board's order, a petition praying that the order of the Board be set aside. Upon the filing of such petition the court shall have jurisdiction to affirm, set aside or modify the order of the Board and to take such action with regard to the matter under review as the court deems proper. The finding of the Board as to the facts, if supported by substantial evidence, shall be conclusive.

tion of a new national bank "would be completely negated in the event that on review the Board's approval of the holding company plan was reversed." *Id.* at 423, 85 S.Ct. at 559.

Finally, the challenged Comptroller's action alone would not violate state law. The state law violation "would occur, if at all, when the Board approved the holding company plan including the organization of [the new national bank] as its subsidiary." *Id.* at 418, 85 S.Ct. at 556.

The court held, on these grounds, that the state banks' true objection was not to the opening of the new bank, but to its opening as a subsidiary of a bank holding company. *Id.* at 417–18, 85 S.Ct. at 555–56. This, the court held, was a matter expressly and exclusively delegated to the Board by its governing statute.[19] Because the acquisition of new banks by bank holding companies "is exclusively within the jurisdiction of the Board," it held, legal challenge was permitted only through the appeal process provided by statute.

> We believe Congress intended the statutory proceedings before the Board to be the sole means by which questions as to the organization of a new bank by a bank holding company may be tested.

*Id.* at 419, 85 S.Ct. at 557.

Thus construed, the court held, the state banks' federal action against the Comptroller was an impermissible collateral attack on the Board's approval of the holding company's formation, over which the district court had improperly exercised jurisdiction.

Defendants claim that Plaintiff's action challenging Maine's conversion statutes and the actions of Maine's Superintendent is, like the state banks' action against the Comptroller in *Whitney*, an impermissible collateral attack on the Board's holding company decision. They claim that, be-

cause Plaintiff could have raised these same claims before the Board, and because the Board could properly have ruled on them,[20] the Board had exclusive jurisdiction over the claims, and Plaintiff is barred from raising them here.

Because of fundamental factual distinctions between *Whitney* and the instant case, however, the Court is unwilling to read *Whitney* so expansively. In *Whitney*, a single legislative body—Congress—had devised a two-pronged statutory system by which new national banks became subsidiaries of new holding companies: the Comptroller authorized the new bank, and the Board approved the new holding company and its acquisition of the new bank.

In devising this scheme, Congress deliberately subordinated the actions of one federal administrative agency to those of the other. It elected that only the Board's actions would be final and reviewable. It made the Board's decisions binding on the Comptroller and gave the Comptroller's decisions no binding legal effect independent of the decisions of the Board. It refused to give the Comptroller a veto over the Board's approval. *See* 379 U.S. at 419, 85 S.Ct. at 556–57.

Further, it vested in the Comptroller only narrow ministerial jurisdictional over new bank authorization, while charging the Boad with broad and exclusive authority to weigh the legal and fiscal propriety of holding company formation *and* all bank transactions relating to it. *Id.*

This simply is not the case under the conversion scheme at issue here. At the outset, Maine's conversion program is the product of two legislatures—one state, one federal—and involves two administrative agencies—one state, one federal. It merges two federal statutory systems—the Fed-

---

**19.** The Board's governing statute, 12 U.S.C. § 1842(a), requires Board approval for "any action ... that causes any company to become a bank holding company" *and* "any action ... that causes a bank to become a subsidiary of a bank holding company."

**20.** It *does* appear that questions as to the constitutionality of state statutes underlying proposed bank holding company transactions fall within

the Board's purview. *See Northeast Bancorp v. Board of Governors,* 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985) (Board considered and rejected claims that Massachusetts statute underlying proposed bank holding company transaction violated Commerce Clause, Equal Protection Clause and Compact Clause of Federal Constitution).

eral Reserve Board governing statutes and the FHLBB regulations—with at least two state statutory plans—Maine's banking code and Administrative Procedure Act.

Under the conversion scheme, Maine Superintendent's rulings on conversions have not been statutorily subordinated to the Board's holding company decisions. In fact, quite the opposite is true. The Board's ruling are not binding on the Superintendent. If the Superintendent rejects a proposed conversion, the conversion fails, whether or not the Board has approved the holding company formation. The Superintendent's conversion decisions are final and are subject to independent review in Maine Superior Court under Maine's Administrative Procedure Act. 5 M.R.S.A. § 11001, *et seq.*

Thus, unlike *Whitney*, it is the Superintendent's action, not the Board's action, that finally permits the conversion and causes the alleged violation of state and federal law. Therefore, Plaintiff's action here cannot properly be characterized as a collateral attack on the Board's holding company decision.

More importantly, under Maine's conversion scheme, jurisdiction over statutory and constitutional questions arising from banking transactions has *not* been exclusively vested in a single administrative body. Indeed, the Superintendent *must* determine, before approving a conversion, that the conversion complies with all state and federal law, statutory and constitutional. And the Maine Superior Courts are statutorily authorized to review and to overturn the Superintendent's decisions if they violate constitutional or statutory provisions. 5 M.R.S.A. § 11008(1).

Thus, by the very language of the challenged statutes, the Board does *not* have exclusive jurisdiction to pass on the consti-

tutionality of statutes underlying mutual-to-stock conversions in Maine. It shares this jurisdiction with Maine's Superintendent and, after him, with Maine's courts.[21] *Whitney* is therefore distinguishable on the most fundamental grounds, and does not bar this Court from hearing Plaintiff's claims.[22]

■ Defendants claim that, if Plaintiff's action is not precluded by state or federal law, then the Court should refrain from exercising jurisdiction under *Burford v. Sun Oil*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1942). Like *Whitney*, however, *Burford* is distinguishable, and does not warrant dismissal at this juncture.

In *Burford*, plaintiff challenged the Texas Railroad Commission's decision to grant an oil well drilling permit to an abutting landowner. The permit had been granted under Texas' complex oil and gas conservation program, under which the Commission had exclusive authority to determine the appropriate spacing of wells and to issue permits accordingly. The federal district court abstained, and the United States Supreme Court affirmed.

Texas' conservation program, the court held, was "as thorny a problem as has challenged the ingenuity and wisdom of legislatures." 319 U.S. at 318, 63 S.Ct. at 1099. The Texas legislature had deliberately created the Commission, and vested it with exclusive permitting authority, to centralize and specialize the difficult permitting process. Plaintiff's action, attacking the Commission's decision to grant a permit, required the federal court to second-guess the very technical and fact-specific determination that lay at the heart of the Commission's expertise.

To review the Commission's decision, the court would itself have had to analyze geologic and economic data, land use and min-

---

21. The Court notes, as an additional and material distinction, that the bank involved in the conversion challenged here was, unlike that in *Whitney*, a *state-chartered* bank, not a national bank.

22. In concluding .that the Board does *not* have exclusive jurisdiction over claims such as those raised here by Plaintiff, and therefore that statu-

tory provisions for appealing Board decisions were not Plaintiff's exclusive remedy for challenging the conversion, the Court does *not* suggest that appeal under Maine's Administrative Procedure Act is the exclusive remedy. No issue has been generated as to the exclusivity of Maine's APA, and the Court therefore intimates no decision on that question.

eral information and fuel market studies to determine whether the permit Plaintiff challenged had been granted appropriately. This, the court held, entailed a high risk of error or inconsistency. If federal court review of the Commission's decisions were permitted over time, it would likely disrupt Texas' entire conservation program by making the federal court a regulatory adjunct to the Commission.

The Court held that where the validity of a substantive administrative determination was at issue, and Texas had deliberately centralized permitting authority in an agency with significant expertise and had provided a comprehensive and adequate system of state court review, federal court intervention was inappropriate, and abstention was warranted.

Post–*Burford* abstention cases have consistently upheld the *Burford* court's focus on the disruption of state policy likely to follow from federal court intervention. *See Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (abstention unwarranted where no disruption of state policy foreseen). *See generally* Charles S. Treat, Abstention by Federal Courts in Suits Challenging State Administrative Decisions: The Scope of the *Burford* Doctrine, 46 U.Chi.L.Rev. 971 (1974).

In distinguishing *Burford* from the instant case, the Court begins with the knowledge that abstention "is an extraordinary and narrow exception [to its] duty ... to adjudicate [the] controversy before it." *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246; *Allstate Insurance Co. v. Sabbagh*, 603 F.2d 228 (1st Cir.1979). With that in mind, the Court finds *Burford* inapplicable on two related grounds.

First, Plaintiff's challenge in this case does not, in the first instance, require the Court to second-guess the Superintendent's technical and fact-specific ruling on the fairness and propriety of Bank's conversion. Plaintiff raises several procedural claims that pose purely legal issues and could obviate the need to review the Superintendent's substantive rulings.

For instance, Plaintiff challenges the Superintendent's failure to promulgate conversion regulations according to Maine's Administrative Procedure Act. if, indeed, the Superintendent was required by Maine's mutual-to-stock conversion statute to promulgate regulations, and to do so according to the APA, his informal adoption of FHLBB regulations may taint the entire conversion proceeding.[23] If the FHLBB regulations were void, and were thus improperly applied in Bank's conversion, the conversion itself may be invalid.

Similarly, Plaintiff has challenged the constitutionality of Maine's presumptive voting statute. If that statute is found to be constitutionally deficient, its operation as to Bank's conversion may likewise be declared unlawful. Because the statute was used to secure the depositors' approval of Bank's conversion, invalidating the statute may nullify the depositors' approval. This, in turn, might by itself justify invalidating the entire conversion, to which depositors' approval was a prerequisite.

Finally, Plaintiff argues that the depositors' approval was invalid because no quorum was present at the voting meeting. If the Court determines—on whatever theory—that a quorum was required, it could likewise determine that the depositors' vote, taken without a quorum, was ineffective. Again, if the depositors' approval is annulled, the conversion itself may well fail.

The resolution of these three purely legal claims falls neatly within the Court's acknowledged ken, and would permit the Court to dispose of Plaintiff's entire action without entangling the Court in the fiscal intricacies of the Superintendent's decision. This was *not* the case in *Burford* where, had the court not abstained, it had no option but to reexamine the Commission's substantive permitting decisions.

---

**23.** The APA renders void all regulations adopted in violation of its provisions. 5 M.R.S.A. § 8057(1).

Second, Defendants have not satisfied the Court that its intervention *at this stage* will necessarily disrupt the coherence of Maine's mutual-to-stock conversion scheme in the manner deemed unacceptable in *Burford*. The Court's initial task here is to resolve the preliminary procedural and federal constitutional questions raised in the three claims just discussed. Should the Court determine that those claims require the invalidation of the conversion or a portion of the regulatory scheme by which it was approved, Maine's regulatory scheme would indeed be disrupted, perhaps even invalidated.

But *Burford* abstention is not warranted simply because resolution of federal questions—or of state questions over which the Court has pendent jurisdiction—could overturn state policy. *Zablocki v. Redhail*, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 677–78 n. 5, 54 L.Ed.2d 618 (1978). Maine has no right to an unconstitutional policy, coherent or otherwise. *Allstate*, 603 F.2d at 232. This Court exists for the very purpose of "disrupting" unconstitutional state policies, and need not defer decision on purely legal questions properly before it for the sake of a state's administrative convenience. This type of "disruption" puts no unacceptable strain on federal-state relations, and causes no "needless conflict with State policy." *See Burford*, 319 U.S. at 327, 63 S.Ct. at 1104.

Further, if substantive issues remain after the Court has addressed and settled the preliminary issues, the Court has at least three options for resolving those issues without entangling itself in the Superintendent's technical and fact-specific rulings. First, it may reopen the *Burford* inquiry, reexamine the risk of disruption, and opt to abstain at that point.

Second, it may consider staying the action under *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), until Maine courts have ruled conclusively on the unsettled questions of substantive state law. *Pullman* permits temporary abstention when resolution of an unsettled state law question may obviate the need to reach federal constitutional questions.

Finally, the Court may consider certifying the novel state law questions to Maine's Law Court. Me.R.Civ.P. 76B; 4 M.R.S.A. § 57; *In re Richards*, 253 F.Supp. 913 (D.Me.1966). Upon certification, the Law Court could determine whether depositors in a mutual association have a protected property interest in the association's net worth that vests upon conversion to stock ownership. Should the Law Court answer in the affirmative, this Court would have only to determine whether Bank's conversion satisfied federal constitutional standards.

These options for substantive resolution of Plaintiff's claims vastly reduce the risk, addressed in *Burford*, of an erroneous or inconsistent federal court ruling on state law. Coupled with the possibility of resolving Plaintiff's claims on preliminary procedural and constitutional grounds, they convince the Court that its intervention *at this juncture* does not unjustifiably disrupt Maine's conversion scheme. On these bases, the Court finds that *Burford* abstention is unwarranted at this stage in the proceedings.

#### C. *Substantive Claims*

■ Defendants claim that even if Plaintiff's action survives these preclusion and abstention attacks, Plaintiff has failed to state a claim, and Defendants are entitled to judgment on the merits. They claim, at the outset, that Plaintiff had only an inchoate interest in Bank's preconversion net worth; that the conversion did not vest Plaintiff's interest; and that the conversion plan adequately protected that interest.

Defendants have not satisfied the Court to the degree of certainty required for judgment on the pleadings that Plaintiff has no protected property interest in Bank's net worth. If nothing else, the pleadings show clearly that this "property interest" question is a highly disputed and unsettled question of state law.

Even the most cursory reading of Maine's statute casts doubt on Defendants' proffered construction. Title 9–B M.R.S.A. § 344, the statute at the heart of the mutu-

al-to-stock conversion program, requires that the converting institution adopt a conversion plan "which shall insure that the interests of depositors ... in the net worth of the institution are equitably provided for." The Court is hard-pressed to believe that the Maine legislature would have provided so explicitly for the protection of an interest as valueless and negligible as Defendants claim.

Both parties have offered case law from other jurisdictions supporting their respective positions. Both have highlighted Maine statutory provisions that imply, in their estimation, that depositors do or do not have a property interest in a mutual association's net worth. The Court is simply unwilling, on the record as it now stands, to find that Defendants are correct *as a matter of law.*[24]

Defendants argue that because the depositors' inchoate interest in a mutual association's net worth vests only upon solvent liquidation, and because conversion bears no legal resemblance to liquidation, Bank's conversion did not vest Plaintiff's interest or entitle him to immediate *pro rata* distribution. They advance, in support of their claim, statutory citations providing that the converted institution "shall be deemed to be a continuation of the entity of the ... converting institution." 9–B M.R.S.A. § 357(1).

Plaintiff argues, however, that because the charter of the converting bank terminates automatically, the corporate purpose and ownership change, and the corporate assets are "sold," conversion constitutes dissolution and vests the depositors' interest in the Bank's net worth. Maine courts have not passed on the issue. Thus, this Court is left with the very sort of dispute over state law that makes judgment on the pleadings inappropriate.

Finally, Defendants claim that even if Plaintiff *had* a vested property interest in Bank's net worth, the conversion plan provided equitably for it. They base their strongest argument in favor of the equity of the conversion on the fact that it complied with FHLBB regulations. They argue that the FHLBB regulations dictated the terms of the conversion plan, governed the appropriate compensation for depositors' interests, and indeed *prevented* them from distributing Bank's net worth to depositors.

It has been questioned, however, whether the FHLBB regulations were validly adopted or applied to Bank's conversion.[25] Thus, it is premature to argue, at this stage of the proceedings, that the conversion is valid because it conformed to FHLBB guidelines. That proposition certainly does not establish the equity of the conversion to the Court's satisfaction, or to the certainty required for judgment on the pleadings.

**24.** This uncertainty over the existence of a property interest prevents the Court from granting judgment on the pleadings on Counts Four through Eight of the Complaint, which allege breach of fiduciary duty, fraudulent and negligent misrepresentation, tortious conversion of property, and unjust enrichment. These claims are inextricably linked to the unsettled property interest issue. The Court cannot discern, for instance, whether Defendants breached their fiduciary duties to Plaintiff by advancing an inequitable conversion plan, without first determining whether Plaintiff had a property interest, and whether the conversion plan compensated him adequately for it.

Likewise, the Court cannot discern whether Defendants misrepresented the effects of the conversion on Plaintiff's property interest, without first determining the *nature* of Plaintiff's property interest and the protections to which it was entitled. Nor can the Court determine whether Bancorp tortiously converted Plaintiff's

property, or whether Bank's new stockholders were unjustly enriched by Plaintiff's property, without determining the value of Plaintiff's property and the adequacy of the compensation he received under the conversion plan. Judgment on the pleadings is therefore unwarranted on Counts Four through Eight.

**25.** Title 9–B M.R.S.A. § 344 refers repeatedly to "regulations promulgated by the superintendent," inferring that the Superintendent was to enact regulations to govern the conversion process. Maine's APA requires that all regulations be adopted pursuant to a formal notice and comment process, 5 M.R.S.A. §§ 8052–8056, and renders invalid those that are not. 5 M.R.S.A. § 8057.

The Superintendent did not formally adopt conversion regulations; he simply declared that the FHLBB regulations would govern Maine conversions.

Defendants claim, finally, that Plaintiff's claim must be dismissed because Maine's Superintendent of Banking is an indispensable party under Fed.R.Civ.P. 19 and cannot be joined because he is immune from suit under the Eleventh Amendment to the United States Constitution. Rule 19 requires the joinder of all third parties whose absence may prevent the court from granting complete relief to the named parties, subject a named party to multiple litigation resulting in double or inconsistent obligations, or prejudice the absent parties' own interests.

Where the absent party is subject to service of process, and where joining that party will not destroy the court's subject matter jurisdiction, the court must order joinder. Fed.R.Civ.P. 19(a). If the absent party cannot be joined, the court must dismiss the action unless it concludes, in equity and good conscience, that the action may proceed with only the named parties. Fed. R.Civ.P. 19(b).

■ Defendants claim that the Superintendent is an indispensable party because the Court will be unable to grant the relief Plaintiff requests in the Superintendent's absence. The Court agrees. Plaintiff has requested that the Court declare Bank's conversion invalid because the Superintendent failed to adopt valid regulations. He has asked the Court to enjoin the Superintendent from approving any further conversions without first adopting conversion regulations pursuant to the APA.[26]

The Court cannot bind absent parties. *Provident Tradesmen Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). Thus, it has no power to enjoin the Superintendent, in his absence, from approving future conversions. Nor could it, in his absence, order him to adopt valid regulations. It cannot, there-fore, grant complete relief unless the Superintendent is joined as a party. Therefore, assuming *arguendo* that the relief prayed for in this action is appropriate, the Superintendent is an indispensable party to this action within the meaning of Rule 19(a).

■ Defendants claim that the Superintendent cannot be joined because he is immune from suit under the eleventh amendment, which bars federal court actions against a state *qua* state.[27] Plaintiff's claims against the Superintendent fall, however, squarely within the eleventh amendment exception treated in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). That exception permits federal constitutional challenges against state *officials* on the theory that an official acting unconstitutionally acts in his individual, not state, capacity, and thus cannot invoke protections intended for state action. It permits a party to challenge, in a single federal action, the official's allegedly unconstitutional enforcement of state law, *and* the statutes the state official is charged with enforcing improperly. 209 U.S. at 157, 28 S.Ct. at 452–53.

Plaintiff here identifies the Superintendent as an officer of the Maine Bureau of Banking, a governmental agency considered an arm of the state for eleventh amendment purposes. *Gay Students Services v. Texas A & M University*, 612 F.2d 160 (5th Cir.1980), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495. He implicitly alleges that the Superintendent, in concert with Defendants, deprived him of constitutionally protected due process and equal protection rights. He claims that the Superintendent had a duty to enforce the allegedly unconstitutional state law. *Ex Parte Young*, 209 U.S. at 157, 28 S.Ct. at 452–53.

---

**26.** There exists a considerable question as to whether Plaintiff has standing to raise this claim. The parties have not generated the standing issue on these motions, and the Court therefore reserves decision until the issue is more appropriately postured.

**27.** By its very language, the eleventh amendment prevents federal courts from exercising jurisdiction over suits against a state brought by citizens of another state or foreign country. The United States Supreme Court has construed it, in addition, to bar federal suits against a state by its *own* citizens. *Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982).

Further, he seeks, against the Superintendent, equitable relief that requires no funds from the state treasury. *See Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974) (in section 1983 action, federal court's remedial power is limited to prospective injunctive and declaratory relief, and may not include a retroactive award that requires payment of funds from state treasury.)[28] The *Ex Parte Young* exception therefore applies to Plaintiff's claims against the Superintendent; the Superintendent is not immune from suit on those claims under the eleventh amendment; the Superintendent may be joined as a party defendant in this action; and dismissal is not warranted under Rule 19(b) until Plaintiff has had an opportunity to join the Superintendent, should he choose to do so.

■ Defendant Pape claims,[29] individually, that Plaintiff has failed adequately to allege that Pape was a "state actor" within the meaning of section 1983.[30] To demonstrate whether facially private conduct rises to the level of state action within the section 1983, the Court must assess the nature, duration and extent of state-private regulatory intermingling.

> The dispositive question in any state-action case is not whether any single fact or relationship presents a sufficient degree of state involvement, but rather whether the aggregate of all relevant factors compels a finding of state responsibility.

*Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 360, 95 S.Ct. 449, 458, 42 L.Ed.2d 477 (1974).

Relevant factors include the state's regulation of the private actor, *Ponce v. Basketball Federation of Puerto Rico,* 760 F.2d 375, 377 (1st Cir.1985); the private actor's willful participation in joint activity with the state or its agents, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); the state's encouragement of private action, *Blum v. Yaretsky,* 457 U.S. 991 (1982); and the interdependence of state and private actors, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Where it can be shown that the activities of private parties were compelled or influenced by government regulation, private action can be attributed to the state. *Ponce v. Basketball Federation,* 760 F.2d at 378–79.

Here, Plaintiff alleges that Defendants, including Pape, met and corresponded "informally" with the Superintendent and the Bureau of Banking to develop an unconstitutional conversion procedure and ease approval of Bank's inequitable conversion plan. He alleges that, with Pape's knowledge and consent, Defendants lobbied the Maine legislature for the passage of an unconstitutional presumptive voting statute. He alleges that, without the Superintendent's significant encouragement, and without the benefit of favorable conversion statutes, Bank could not have converted, and thus could not have deprived him of his interest in Bank's net worth. Finally, he

**28.** Plaintiff seeks monetary damages ($150 million compensatory, $50 million punitive) only from the named Defendants. He seeks, in addition, declarations that the conversion is invalid, the presumptive voting statute unconstitutional, the Superintendent's failure to adopt regulations unlawful, the FHLBB regulations inapplicable, and the depositors' approval of Bank's conversion ineffective. He seeks injunctions to restore the parties to their preconversion status, and to prohibit the Superintendent from approving any future conversions without first adopting valid regulations.

**29.** Defendant Masterton has "reserve[d] the right to argue at a later point that the 1983 claims must be dismissed because the defend-

ants are private persons who did not act under color of state law," *see* Defendant Masterton's Memorandum in Support of Motion for Judgment on the Pleadings, n. 2, but has not raised the issue on these motions.

**30.** Title 42 U.S.C.A. § 1983, which creates a private cause of action against state officials charged with depriving a plaintiff of constitutionally protected rights, extends its coverage to purely private actors whose participation in the challenged conduct is so closely linked to the state that it is cloaked with "state" status for the purposes of suit under section 1983. *See generally Jackson v. Metropolitan Edison Co.,* 483 F.2d 754 (C.A.Pa.1973), *aff'd,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477.

claims that Bank is so heavily regulated by the state that it may be considered a quasi-public entity in its own right.

Taken in their entirety, and construed in the light most favorable to Plaintiff, Plaintiff's claims allege state action with sufficient specificity to survive Defendant Pape's motion to dismiss.

## VII. CONCLUSION

The Court concludes, on the record before it on this motion, that Plaintiff's action is not precluded by state or federal law; that abstention under *Burford v. Sun Oil Co.* is not warranted; that judgment on the pleadings is not appropriate on the merits; that Maine's Superintendent of Banking may be an indispensable party and may be joined under *Ex Parte Young;* and that Plaintiff has alleged state action with sufficient specificity to survive Defendant Pape's motion to dismiss.

Accordingly, the Court ORDERS that Motions for Judgment on the Pleadings filed by Defendants Maine Savings Bank, The One Bancorp, and Robert Masterton be, and they are hereby DENIED. The Court further ORDERS that Plaintiff have until August 15, 1988 to join Maine's Superintendent of Banking as a party defendant; and that Defendant Frederick Pape's Motion to Dismiss be, and it is hereby, DENIED.